## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

| | |
|---|---|
| **FRED D. DOUTY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | )      **Civil Action No. 2:13-32832** |
| | ) |
| **JIM RUBENSTEIN,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendants' Motion for Summary Judgment (Document No. 169), filed on September 23, 2015. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document No. 171.) Plaintiff filed his Response in Opposition on October 9, 2015. (Document Nos. 172 and 173.) Defendants filed their Reply on November 6, 2015. (Document No. 184.) Having examined the record and considered the applicable law, the undersigned has concluded that Defendants' Motion for Summary Judgment should be granted in part and denied in part. Specifically, the undersigned recommends that Defendants' Motion for Summary Judgment be (1) granted as to Plaintiff's claims against Defendants Rubenstein, Perry, Williams, and Hahn, (2) granted as to Plaintiff's claim against Defendant Hudson for battery occurring on September 30, 2013, and (3) denied as to all remaining claims.

### PROCEDURAL BACKGROUND

On December 20, 2013, Plaintiff, acting *pro se,* filed his Motion to Proceed Without

Prepayment of Fees and Complaint claiming entitlement to relief pursuant to Title 42 U.S.C. § 1983.[1] (Document Nos. 1 and 2.) In his Complaint, Plaintiff first alleged that Defendants violated his, and other similarly situated inmates', rights under the Eighth Amendment by applying excessive force through use of chemical agents and other "riot-type" instruments while inmates were housed in segregation. (Document No. 1.) Plaintiff also alleged that Defendants violated his First Amendment rights by retaliating against him for filing grievances. (Id.) On December 31, 2013, Plaintiff filed his Motion for Preliminary Injunction, Declaration, and Memorandum in Support. (Document Nos. 5 - 7.)

On February 7, 2014, Plaintiff filed his Amended Complaint. (Document No. 8.) In his Amended Complaint, Plaintiff recognized that he could not pursue this matter as a class action and stated that he wished to proceed only on his own behalf. (Id.) In his Amended Complaint, Plaintiff named the following as defendants: (1) Jim Rubenstein, Commissioner of the West Virginia Division of Corrections; (2) David Ballard, Warden of Mount Olive Correctional Complex ["MOCC"]; (3) Paul Perry, Associate Warden of Security; (4) Ronnie Williams, Captain; (5) Daniel Hahn, Lieutenant; (6) Andrew Hudson, Corporal; (7) Joshua Hypes, Correctional Officer II; (8) Chris Hess, Corporal; (9) Nicholas Boychuck, Correctional Officer; and (10) Sergeant Joe Wimmer. (Id.) Plaintiff complains that on September 2, 2013, Defendants subjected him to excessive force by spraying him with chemical agents when he was not a threat to security and was locked in his isolated segregation cell. (Id.) Plaintiff further alleges that Defendants' conduct constituted deliberate indifference to his health and safety, and resulted in an assault and battery under West Virginia law. (Id.) As relief, Plaintiff requests monetary damages and declaratory and

---

[1]   Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

injunctive relief. (Id.)

By Order entered on August 7, 2014, United States Magistrate Judge Dwane L. Tinsley granted Plaintiff's Motion to Proceed Without Prepayment of Fees and directed the Clerk to issue process in this case by preparing and serving a Summons and a copy of Plaintiff's Amended Complaint upon the Defendants. (Document No. 15.) By Proposed Findings and Recommendation also entered on August 7, 2014, Judge Tinsley recommended that Plaintiff's Motion for Preliminary Injunction be denied. (Document No. 16.) Plaintiff filed his Objections on August 25, 2014. (Document No. 28.) Defendants filed their Answer on August 28, 2014. (Document No. 29.) By Memorandum Opinion and Order entered on August 29, 2014, United States District Judge John T. Copenhaver, Jr., adopted Judge Tinsley's recommendation and denied Plaintiff's Motion for Preliminary Injunction. (Document No. 30.)

By Order entered on November 12, 2014, the above civil action was transferred from Judge Tinsley to United States Magistrate Judge R. Clarke VanDervort for total pretrial management and submission of proposed findings of fact and recommendations for disposition. (Document No. 42.) By Order entered on November 19, 2014, Judge VanDervort set forth deadlines for the completion of discovery and the filing of dispositive motions. (Document No. 46.) Plaintiff filed multiple Motions to Compel, some of which were granted in part. (Document No. 40, 49, 65, 73, 75, 82, 91, 100, 102, 123, 158.)

On September 23, 2015, Defendants filed their Motion for Summary Judgment and Memorandum in Support. (Document Nos. 169 and 170.) Defendants argue that Plaintiff's claims should be dismissed based upon the following: (1) Plaintiff's claim against all Defendants, as related to the use of force, must fail "[b]ecause Defendant Andrew Hudson's spraying of Inmate

Douty was a good faith effort to maintain order, which was beginning to be restored" (Document No. 170, pp. 8 - 11.); (2) "The use of force in spraying Inmate Douty with Oleoresin Capsicum was applied in good faith to restore order, and therefore the Plaintiff's claims against all the Defendants as related to the use of force must fail" (Id., pp. 11 - 15.); (3) "Inmate Douty's claims are barred against all of the Defendants by the doctrine of qualified immunity" (Id., p. 16.); (4) "The Plaintiff has failed to offer any evidence that Officer Hudson was deliberately indifferent to a substantial risk of serious harm to the Plaintiff" (Id., pp. 16 - 17.); (5) "The Plaintiff has failed to offer any evidence that he was denied medical attention for serious medical need by Officer Hudson or any of the other Defendants named herein in violation of the Eighth Amendment" (Id., pp. 17 - 18.); (6) "Plaintiff's assault and battery claims against Officer Hudson must fail as Officer Hudson was privileged to use such force against the Plaintiff" (Id., pp. 19 - 20.).

As Exhibits, Defendants attach the following: (1) The deposition transcript of Plaintiff (Document No. 169-1.); (2) The Affidavit of Andrew Hudson regarding Inmate Samuel Ramsey (Document No. 169-2.); (3) The Affidavit of Andrew Hudson regarding Plaintiff (Document No. 169-3.); (4) The Affidavit of Captain Brian Penick (Document No. 169-4.); (5) A copy of MOCC's Confidential Report dated September 9, 2013, regarding the use of force incident involving Plaintiff (Document No. 169-5.); (6) A copy of Lewis v. White, 2010 WL 2671495 (S.D.W.Va. June 8, 2010)(J. VanDervort) (Document No. 169-6.); (7) A copy of the Incident Reports against Plaintiff as reported by Officer Joe Wimmer on September 2, 2013 (Document No. 169-7.); and (8) A copy of the Incident Report against Inmate Roger Smith as reported by Officer Nicholas Boychuck on September 2, 2013 (Document No. 169-8.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to

Plaintiff on October 1, 2015, advising him of the right to file a response to the Defendants' Motion for Summary Judgment. (Document No. 171.) On October 9, 2015, Plaintiff filed his Response in Opposition and Memorandum in Support. (Document Nos. 172 and 173.) First, Plaintiff argues that Defendants' Motion should be denied "because a genuine issue of material fact exists." (Document No. 172.) Second, Plaintiff claims that "Commissioner Rubenstein and Warden Ballard's policy or custom of martial law [with] no effort to temper in segregation, violates the Eighth Amendment." (Document No. 173, pp. 8 - 11.) Third, Plaintiff asserts "Officer Hudson's attack of [Plaintiff] violated the Eighth Amendment." (<u>Id.</u>, pp. 11 - 15.) Fourth, Plaintiff contends "Officers Hypes, Hess, and Boychuck failed to intervene and protect [Plaintiff]." (<u>Id.</u>, pp. 16 - 17.) Finally, Plaintiff argues that his "claims are not barred against all of the Defendants by the defense of qualified immunity." (<u>Id.</u>, pp. 17 - 18.)

As Exhibits, Plaintiff attaches the following: (1) A copy of the transcripts of the deposition of Plaintiff (Document No. 172-1.); (2) A copy of Plaintiff's Affidavit (Document No. 172-2, pp. 1 - 6.); (3) A copy the Affidavit of Inmate Keith W.R. Lowe (<u>Id.</u>, p. 7.); (4) A copy of the Affidavit of Inmate Jerry McFarland (<u>Id.</u>, p. 8.); (5) A copy of the Affidavit Inmate [illegible] (<u>Id.</u>, pp. 9 - 10.); (6) A copy of the Affidavit Inmate Roger Smith (<u>Id.</u>, pp. 11 - 12.); (6) A copy of the Affidavit of Inmate Douglas Ganoe (<u>Id.</u>, pp. 12 - 15.); (7) A copy of the Affidavit of Inmate Brian Gregg (<u>Id.</u>, pp. 16 - 17.); (8) A copy of the Affidavit of Inmate Samuel Ramsey (<u>Id.</u>, p. 18.); (9) A copy of Plaintiff's pertinent medical records (Document No. 172-3, pp. 2 - 5.); (10) A copy of "Defendants' Responses to Plaintiff's Third Requests for Admissions" (<u>Id.</u>, pp. 7 - 12.); (11) A copy of "Defendants' Answers to Plaintiff's First Set of Interrogatories and Responses to Plaintiff's Second Request for Production of Documents" (<u>Id.</u>, pp. 14 - 20.); (12) A copy of Inmate

Roger Smith's "Unit Team Request Form Quilliams 2" dated August 26, 2013 (Id., p. 22.); (13) A copy of "Andrew Hudson's Responses to Plaintiff's First Requests for Admission" (Id., pp. 24 - 30.); (14) A copy of an e-mail from Brian R. Penick from Robert E. Rhodes dated September 9, 2013, regarding "protocol" (Id., p. 34.); (15) A copy of Plaintiff's grievance dated April 29, 2014 (Grievance No. 14-MOCC-Q2-548) (Id., p. 36.); (16) A copy of Plaintiff's grievance dated April 30, 2014 (Grievance No. 14-MOCC-Q2-570) (Id., p. 37.); (17) A copy of Inmate Samuel Ramsey's Incident Report dated September 2, 2013, issued by Officer Andrew Hudson (Id., p. 39.); (18) A copy of Plaintiff's Incident Report for "Refusing an Order" issued by Officer Andrew Hudson on September 2, 2013(Id., p. 40.); (19) A copy of Plaintiff's Incident Report for "Insubordination/Insolence" issued by Officer Andrew Hudson on September 2, 2013(Id., p. 41.); (20) A copy of Plaintiff's Incident Report for "Creating a Disturbance" issued by Officer Andrew Hudson on September 2, 2013 (Id., p. 43.); (21) A copy of Plaintiff's grievance dated September 2, 2013 (Grievance No. 13-MOCC-Q2-1235) (Id., p. 45.); (22) A copy of Plaintiff's grievance dated September 3, 2013 (Grievance No. 13-MOCC-Q2-1211) (Id., p. 46.); (23) A copy of the WVDOC's Policy Directive Number 313.02 regarding the "Calculated Use of Force" (Id., pp. 48 - 62.); (24) A copy of the product label for "Phantom OC" by Sabre (Id., p. 64.); (25) A copy of Plaintiff's grievance dated September 13, 2013 (Grievance No. 13-MOCC-Q2-1277) (Id., p. 66 - 67.); (26) A copy of Plaintiff's grievance dated September 3, 2013 (Grievance No. 13-MOCC-Q2-1212) (Id., p. 69.); (27) A copy of Plaintiff's grievance dated September 3, 2013 (Grievance No. 13-MOCC-Q2-1213) (Id., p. 71.); and (28) A copy of an article published by Duke University Health System entitled "Health Hazards of Pepper Spray" as written by C. Gregory Smith, M.D. and Woodhall Stopford, M.D. (Id., pp. 73 - 76.).

6

On November 12, 2015, Defendants' filed their Reply.[2] (Document No. 184.) As Exhibits, Defendants attach the following: (1) A copy of Inmate Roger Smith's "Unit Team Request Form Qulliams 2" dated August 26, 2013 (Document No. 184-1.); (2) A copy of the Affidavit of Warden Ballard (Document No. 184-2.); and (3) A copy of the Affidavit of Captain Brain Penick (Document No. 184-3.).

On November 25, 2015, Plaintiff filed a "Motion for Leave to Amend and/or Supplement Roger Dwayne Smith's Affidavit." (Document No. 188.) In support, Plaintiff argues that "[t]he Defendants after submitting their original motion for summary judgment along with attached affidavits, specifically Brian Penick's [affidavit], have now filed another affidavit by Mr. Penick." (Id.) Plaintiff contends that "[i]t is only proper that the Plaintiff be allowed to file an affidavit by inmate Smith to rebut Mr. Penick's allegation." (Id.) As Exhibits, Plaintiff attaches the following: (1) A copy of Inmate Roger Dwayne Smith's Amended Affidavit (Document No. 188-1.); and (2) A copy of Inmate Roger Smith's pertinent medical records (Document No. 188-2.).

Also on November 25, 2015, Plaintiff filed a "Motion to Strike Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment." (Document No. 189.) Plaintiff argues that "[i]nstead of addressing any purposed new issues, however, the Defendants' counsel launches into a lengthy, and largely spurious, rehash of the entire case." (Id.) Plaintiff claims that "[a]ll the issues addressed were raised by the Plaintiff in his Amended Complaint" and "Defendant unequivocally could have addressed every one of these issues in their original Motion for Summary Judgment and Supporting Memorandum." (Id.)

On December 4, 2015, Defendants filed their "Response to Plaintiff's Motion to Strike

---

[2]    The Court granted Defendants' Motions for Extensions of Time regarding the filing of their Reply. (Document No. 174, 175, 178, 181.)

Defendants' Reply Memorandum of Law" arguing that "Plaintiff's Motion is spurious and has no basis whatsoever." (Document No. 190.) Defendants note that Plaintiff's Response "focused almost exclusively on the proposition that 'martial law' has been implemented at Mount Olive Correctional Complex by Warden David Ballard." (Id.) Defendants state that "Plaintiff hoped to convince this Court that the conduct of all correctional officers who interacted with the Plaintiff carried out their official actions as a part of 'martial law.'" (Id.) Defendants contend that they "sought to demonstrate conclusively in their Reply Memorandum that 'martial law' is a fiction." (Id.) Defendants note that "[t]hrough Affidavits submitted by Warden David Ballard and Captain Brian Penick, these Defendants explained under oath that 'martial law' is not a term of art that has ever been employed at the Mount Olive Correctional Complex." (Id.)

On December 4, 2015, Defendants filed their "Response to Plaintiff's Motion for Leave to Amend and/or Supplement the Affidavit of Roger Dwayne Smith." (Document No. 191.) First, Defendants argue that "the allegations set forth in Mr. Smith's Affidavit are hearsay." (Id.) Defendants contend that "Mr. Smith refers to an unidentified correctional officer who freely communicates which inmates; however, correctional officers are forbidden to communicate with inmates in this manner at the Mount Olive Correctional Complex." (Id.) Second, Defendants claim that the Affidavit is nonsensical. (Id.) Defendants contend that "[t]he notion that a correctional officer would go home and Google the term 'martial law' to suggest that Warden David Ballard is somehow confused about the use of this term is ridiculous." (Id.) Third, Defendants state that they "have no idea how one inmate or several inmates cobbled together the document which the Plaintiff has offered to argue that 'marital law' was in effect at Mount Olive." (Id.) Finally, Defendants assert that "while the Court may wish to receive Roger Dwayne Smith's Amended

Affidavit and consider it in conjunction with the Defendants' Motion for Summary Judgment, the weight to be given to this Affidavit is extremely minimal as the Affidavit is nonsensical and full of inadmissible hearsay from individuals who are not available, if they even do exist, to testify before this Court." (Id.) By Order entered this day, the undersigned has granted Plaintiff's above "Motion for Leave to Amend and/or Supplement Roger Dwayne Smith's Affidavit."

On December 16, 2015, Plaintiff filed his "Reply to Defendants' Response to Plaintiff's Motion to Strike Defendants' Reply Memorandum of Law." (Document No. 196.) First, Plaintiff states that Defendants "never deny that the Amended Complaint contains a count against them concerning 'martial law'" or that they could have addressed this claim in their Motion for Summary Judgment. (Id.) Second, Plaintiff complains that Defendants "waited until their reply to answer count three from the Amended Complaint." (Id.) Plaintiff asserts that "[t]his tactic was done with the intent to disguise their 'new' motion for summary judgment as a reply memorandum, which violates the Federal Rules of Civil Procedure." (Id.) By Order entered this day, the undersigned has denied Plaintiff's above "Motion to Strike Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment."

By Order entered on January 6, 2016, the above case was referred to the undersigned for submission of proposed findings of fact and a recommendation for deposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 198.)

## SUMMARY OF EVIDENCE

Plaintiff is currently serving a life sentence for first degree murder, with the recommendation of mercy. (Document No. 172-1, p. 5.) At the time of the incident, Plaintiff was housed in the Quilliams II Unit, a maximum security segregation unit. (Id.) In April 2010, Plaintiff

was placed in the Quilliams II Unit due to various rule violations such as "exposing body fluids, assault with a weapon or gas, and various other minor incidents." (Id., p. 6.) Plaintiff states that he was returned to general population in May, 2015, after being housed in the Quilliams II Unit for approximately five years. (Id.)

The underlying incident occurred on September 1 and 2, 2013. (Id., pp. 9 - 10.) The incident began when Inmate Samuel Ramsey and Inmate Roger Smith intentionally flooded their cells. (Id., p. 10.) Inmate Smith was upset because he had not received mental health attention for approximately two weeks and was allegedly threatening suicide. (Id.) In an effort to get the attention of correctional officers, Inmates Smith and Ramsey continuously flushed their toilets to flood their cells. (Id.) In an effort to stop the flooding, Defendant Hudson sprayed Inmate Ramsey with Oleoresin Capsicum ["OC"] spray and Defendant Boychuck sprayed Inmate Smith with OC spray. (Document No. 169-2 and Document No. 169-8.) Inmates Smith and Ramsey were subsequently removed from their cells and escorted for decontamination. (Id.) By Incident Report prepared by Sergeant Joe Wimmer on September 1, 2013, Plaintiff was charged with Insubordination/Insolence based upon Plaintiff's yelling of obscenities during the extraction of Inmate Smith. (Document No. 169-7.) This Incident Report was later dismissed.[3] (Document No. 172-2.) The incident involving Plaintiff being sprayed with OC occurred approximately two hours later after the incidents with Inmates Ramsey and Smith had been resolved. The events surrounding Plaintiff being sprayed with OC spray are in dispute.

In Defendant Hudson's sworn affidavit, he states that he completed the decontamination of

---

[3]   The Court has viewed the "Decontamination Video" of Inmate Smith, which contains audio of another inmate quoting the Constitution while Inmate Smith was being removed from his cell and escorted for decontamination. Based on the Court's prior review of a video containing the decontamination of Plaintiff, the undersigned notes that the voice of the inmate quoting the Constitution appears to be the voice of Plaintiff. There was no audio of an inmate yelling obscenities. (Document No. 125.)

Inmates Smith and Ramsey's cells at 23:24 hours and exited Quilliam II Unit without further incident. (Document No. 169-2.) Defendant Hudson states that "while order had been restored with regards to Inmate Ramsey and Inmate Smith, [Plaintiff] caused another disturbance to commence during the eradication and clean-up of the standing water." (Document No. 169-3.) Specifically, Defendant Hudson explains as follows:

> 7.      At approximately 01:12 hours, I proceeded to Cell 410 and ordered [Plaintiff] to be quiet, sit on his bunk and to quit yelling across the pod. [Plaintiff] was yelling, "Start cleaning up the water whore, you need to do what I said whore." These comments were volatile and *could have* aroused additional inmates to start new disturbances. I began giving [Plaintiff] loud, clear and repetitive verbal commands again in another effort to temper the situation. [Plaintiff] however, displayed verbal non-compliance once again and would not follow the security orders that I had given to him. At this time, I deployed two-one second burst of Oleoresin Capsicum from a Sabre Red Mark IX Phantom Cell buster (S/N: 2866632 Expiration Date: 5/2018)under the door of cell A10 for an area saturation in an attempt to maintain control of an already disruptive unit.

> 8.      At approximately 01:28 hours, I reentered Pod 4 as a Less Lethal Assistance Officer with the SA-200 Pepper Ball Gun (S/N:22406) for the escort of [Plaintiff] to the recreation yard for decontamination by LPN Joyce Coleman. (The Pepper Ball Gun was only used for brandishing to demonstrate to the inmate population that the officers were serious about bringing this matter under control.) I then escorted [Plaintiff] to the shower where he was secured in Pod 8 for further decontamination without further incident.

> *   *   *

> 11.      Under such circumstances with two inmates, Ramsey and Smith flooding their respective cells almost contemporaneously, and with [Plaintiff's] refusal to stop yelling and creating a volatile atmosphere in the Quilliams II Segregation Unit, the spraying of [Plaintiff] was necessary in order to bring the disturbance to a swift conclusion, restore order, and to avoid possible further disturbances and incidents in the Quilliams II Unit from other inmates.

(Document No. 169-3)(emphasis added). As Exhibits, Defendant Hudson also attaches a copy of

the Incident Report regarding the "Spontaneous Use of Force" (Incident Report No. 13-4989 and three Incident Reports charging Plaintiff with Creating a Disturbance, Insubordination/Insolence, and Refusing an Order on September 2, 2013 (Incident Report Nos. 13-14986, 13-4987, 13-4988, (Document No. 169-3, pp. 7 - 13.). The foregoing Incident Reports were prepared by Defendant Hudson and are consistent with his Affidavit. (Id.)

In Captain Brian Penick's Affidavit, he states that he is the Quilliams Segregation Commander and it is his responsibility to "supervise security operations and ensure that appropriate security procedures are used to control maximum-security segregation inmates." (Document No. 169-4.) Captain Penick states that he is "familiar with the various incidents that occurred on September 1 and 2, 2013."[4] (Id.) Captain Penick describes the events of September 1 and 2, 2013, consistent with Defendant Hudson's account. (Id.) Captain Penick states that he has "no criticism of Officer Hudson" and he believes Defendant Hudson "acted appropriately to bring what the officers feared could become a greater disturbance under control by using a soft tactic to force [Plaintiff] to cease his verbal abuse of the officers who were trying to clean up the mess caused by Inmate Ramsey's flooding of his cell." (Id.) Captain Penick further states that "[f]looding causes a safety hazard" because "[o]fficers may slip and fall and be injured due to flooding and several officers must leave their assigned duties and responsibilities from other areas of the correctional facility in order shut off the water to prevent additional flooding and to clean up/squeegee the water resulting from flooding in an expeditious manner." (Id.) Finally, Captain Penick states that "[t]he use of Oleoresin Capsicum is an intermediate control tactic and is considered a 'soft' measure on the force continuum of possible responses to be utilized in gaining an

---

[4] There is no indicate that Captain Penick was present during any of the incidents that occurred on September 1 and 2, 2013.

inmate's compliance." (Id.)

The "Confidential Report" indicates that the "Reported Facts of Incident" to be consistent with Defendant Hudson's Incident Reports. (Document No. 169-5.) The Committee determined that "Officers' use of force was applied as a good faith effort" and "[t]here was a need for the force used and it was not excessive." (Id.)

The "Incident Report" prepared by Sergeant Joe Wimmer regarding "Inmate Escort/Decontamination of Cell" indicates that Plaintiff was removed from his cell at 0128 hours for decontamination. (Document No. 169-7.) The Incident Report states that the following officers were involved the in the decontamination process: Corporal Chris Hess, Corporal Andrew Hudson, C.O. Joshua Hypes, C.O. Nicholas Boychuck, and Sergeant Wimmer. (Id.) The Incident Report indicates that Plaintiff was compliant during the decontamination process and Plaintiff was evaluated by Licensed Practical Nurse ["LPN"] Joyce Coleman. (Id.) Following the evaluation and initial decontamination by LPN Coleman, Plaintiff was escorted to the shower for further decontamination. (Id.) At 0214 hours, Sergeant Wimmer states that he and C.O. Boychuck decontaminated Plaintiff's cell with soap and water. (Id.) Plaintiff was returned to his cell without further incident at 0232 hours. (Id.)

In Plaintiff's sworn Affidavit, he states that Officers Hudson, Hess, Boychuck, and Hypes came back into the pod approximately one to two hours after the incident involving Inmates Smith and Ramsey had been resolved. (Document No. 172-2, pp. 1 - 7.) Plaintiff states that Defendant Hudson was carrying "a large canister of OC spray" when he entered the pod and that Defendant Hudson "then gave a verbal command to shut the pod's water off." (Id.) Plaintiff then states that the following occurred:

18.     . . . Once the water had been shut off, Officer Hudson threatened to spray

13

inmates on the bottom tier. During that time, I was quoting the Constitution and asked 'why had my water been turned off.' Officer Hudson became overly angry and aggressive saying something to Officer Hypes; and running up the stairs to my cell, without any warning or commands, placed a wand attached to the OC spray under the door deploying one single burst lasting 4 - 7 seconds long. It covered my face, abdomen, arms, legs, and thighs. After Hudson sprayed me, he said "we don't need a reason to spray you, you Jewish motherf**cker." I was not creating a disturbance, inciting other inmates or interfering with officers; and had Hudson, or any officer, given me a command, I would have complied.

19.   When Officer Hudson deployed OC spray on me Officers Hess, Hypes, and Boychuck stood directly around Hudson and did nothing to intervene or protect me. They never said 'no, don't, stop or that's enough' throughout the 4 - 7 second burst of spray. Moreover, Officer Hypes made the comment "f**ck that kike" walking away laughing.

* * *

21.   After 10 - 25 minutes of being sprayed, Officer Hypes and Hess entered pod 4 and came to my cell. At the time, I had been pushing my emergency button because I was experiencing breathing complications and extreme burning on skin. Officer Hypes was armed with a 40 mm bean bag gun. When Hypes approached my cell, I plead for help asking to be taken out of the cell and be decontaminated, informing Officer Hypes that I was having trouble breathing and it felt like my skin was on fire and melting. However, Officer Hypes opened my bean hole and threatened to shoot me if I continued to hit my emergency button. Telling me to "shut the f**ck up" or he'll shoot. As a result of Officer Hypes' aggressive tone, I became terrified and got face down on the floor. Officer Hypes then shut the bean hole and left the pod. Officer Hess remained at the top of the stairs watching never trying to intervene or protect me.

22.   I was left inside the cell around 40 - 50 minutes covered with OC spray before being removed and decontaminated. While I was in the cell, I experienced respiratory problems, burning skin, eyes, nose and throat. Because my water was disabled, I was left only with toilet water as a means to alleviate the pain. I was seen and diagnosed by a physician as suffering first-degree chemical burns several days later after the incident in dispute. Moreover, had I not been sprayed and left inside the cell so long with such an exorbitant amount of OC, I would not have received those chemical burns.

(Id.)

In his "Declaration Under the Penalty of Perjury," Inmate Keith W.R. Lowe states that Defendant Hudson and Hypes came to his cell asking if he was flooding it. (Id., p. 7.) Inmate Lowe states that he responded "no" and Plaintiff "was yelling at C.O. Hudson and C.O. Hypes that they couldn't spray me for flooding my cell." (Id.) Inmate Lowe explains that Defendant Hudson grabbed the OC spray and "said clear as day, 'I'm going to spray this Jewish Bastard.' He then walked straight up the stairs to [Plaintiff's] cell and yelled at him saying something like get on the ground, I couldn't quite hear exactly what was being said, but then I could hear the can of OC being sprayed for about 4 - 5 seconds. The guards then left the pod." (Id.) Inmate Lowe states that approximately 10 minutes later, "I saw C.O. Hypes run in the pod and run upstairs with a 37 or 40 mm riot shotgun, he went to [Plaintiff's] cell and began yelling really loud, 'I will f**ck you up motherf**cker.'" (Id.) Inmate Lowe states that Plaintiff was not removed from his cell for decontamination until approximately 40 minutes later. (Id.)

In his Declaration Under the Penalty of Perjury, Inmate Jerry McFarland states that he has a cell next to Inmate Lowe. (Id., p. 8.) Inmate McFarland states that when C.O. Hudson and C.O. Hypes asked Inmate Lowe if he was flooding his cell, "[a]nother inmate on the top tier, [Plaintiff], was yelling at them, telling them that they couldn't spray Inmate Lowe for no reason." (Id.) Inmate McFarland states that Defendant Hudson "turned to C.O. Hypes and stated 'I'm going to spray that Jew Bastard;' they then went upstairs and sprayed [Plaintiff]." (Id.)

In a Declaration Under the Penalty of Perjury, Inmate [name illegible] states that Plaintiff "was trying to explain to the [guards] that they couldn't spray inmates for requesting mental health." (Id., pp. 9 - 10.) Inmate [illegible] states that "all of a sudden, without warning, guard Hudson opened the bean hole and started to unload his can of OC in [Plaintiff's] face. Hudson said

'we don't have to have a reason to spray you, you Jewish motherf**cker. We can spray you anytime we feel like it. Get on the ground. Get on the ground.'" (<u>Id.</u>) Inmate [illegible] states that the officer left Plaintiff suffering in pain and Plaintiff was "pushing the emergency button, screaming for help." (<u>Id.</u>) Inmate [illegible] states that approximately 30 minutes later, Officer Hypes returned carrying a shotgun and instructed Plaintiff to "shut the f**ck up and lay down." (<u>Id.</u>) Inmate [illegible] explains that officers did not return to escort Plaintiff for decontamination for approximately 40 to 45 minutes after Plaintiff was sprayed with the OC. (<u>Id.</u>)

In a Declaration Under the Penalty of Perjury, Inmate Roger Smith states Plaintiff "was sprayed with chemical agents by C.O. Hudson because he was standing at this door talking." (<u>Id.</u>, pp. 11 - 12.) Inmate Smith acknowledges that he and Inmate Ramsey were flooding their cells to "get the attention of the officers so I could get some mental health help because I was having an anxiety attack and mental breakdown." (<u>Id.</u>) Inmate Smith states that he and Inmate Ramsey were sprayed with OC "and taken out of our cells to the recreation yard and then to a shower and brought back to our cell." (<u>Id.</u>) Inmate Smith states that Plaintiff "was not flooding and didn't even have water anywhere around his cell or in his cell. He lives on the top tier. [Plaintiff] took no part in the flooding at all. At the time [Plaintiff] was sprayed with chemical agents, all the water in the pod was shut off." (<u>Id.</u>) Inmate Smith explains as follows:

> When [Plaintiff] asked why they were spraying other inmates with pepper spray, Officer Hudson stated "I don't need a damn reason to spray anyone you Jewish motherf**cker." Then Officer Hudson came to [Plaintiff's] cell and sprayed him. The officers left the pod and came back and an officer opened [Plaintiff's] food slot and Officer Hypes threatened to shoot [Plaintiff] with a 37 mm riot gun because he wasn't sitting on his bed. Officer hypes said, "get on your bed, I said get on your f**cking bed. I'm about to f**ck you up motherf**cker." [Plaintiff] said, "I'm ready to come out." Officer Hypes said, "You'll come out when we say you're ready to come out." The officer left the pod and came back 10 minutes later to get [Plaintiff].

16

(<u>Id.</u>)

In a Declaration Under the Penalty of Perjury, Inmate Douglas Ganoe states that he was housed in a cell next to Plaintiff on September 2, 2013. (<u>Id.</u>, pp. 13 - 14.) Inmate Ganoe states that he watched Officer Hudson and three other C.O.s shut the water off for pod 4. (<u>Id.</u>) Inmate Ganoe states that Plaintiff "did ask Cpl Hudson 'why are you shutting my water off, there is no water in my cell or out in front of my cell." (<u>Id.</u>) Inmate Ganoe states that Plaintiff was "yelling out his door that they could not spray inmates just for asking for mental health or flooding their cells." (<u>Id.</u>) Inmate Ganoe explains that "Cpl Hudson went to 410, put a hose under his door, and started spraying him with pepper spray for 5 - 10 seconds and said 'we don't need a reason to spray you, you Jewish motherf**cker' and then I heard C.O. Hypes say 'f**cking kike' or 'f**ck that kike,' while they were leaving his cell." (<u>Id.</u>) Inmate Ganoe states that while the officers were leaving Plaintiff's cell, Plaintiff "was screaming in pain and pushing his call button" and "Hypes came back to [Plaintiff's] cell with a 37 or 40 mm shotgun screaming 'I will f**ck you up' and 'I'm about to f**ck you up." (<u>Id.</u>) Inmate Ganoe states that Officer Hypes left, and 40 to 50 minutes later officers took Plaintiff out of his cell for decontamination. (<u>Id.</u>)

In a Declaration Under the Penalty of Perjury, Inmate Brian Gregg states that he witnessed Defendant Hudson "shoot [Plaintiff] with pepper spray." (<u>Id.</u>, p. 16.) Inmate Gregg states that Plaintiff "wasn't flooding his cell or destroying state property," but Plaintiff told Defendant Hudson "what he was doing was against the law." (<u>Id.</u>) Inmate Gregg states that officers left Plaintiff in his cell for over 30 minutes after he was sprayed with OC and he saw Plaintiff's face later in the week and "it was scarred with red marks." (<u>Id.</u>)

In a Declaration Under the Penalty of Perjury, Inmate Samuel Ramsey states that he "heard

C.O. Hudson tell [Plaintiff], cell 410, that 'I don't need a reason to spray you, you Jewish motherf**cker." (Id., p. 18.) Inmate Ramsey stated that "then C.O. Hudson threatened to shoot him with the gun because he wouldn't sit down on the bunk. C.O. Hypes then yelled, 'I will f**ck you up, I'm about to f**ck you up." (Id.) Inmate Ramsey explains that the officers "left the pod and came back later and took [Plaintiff] out of the pod." (Id.)

During Plaintiff's deposition, Plaintiff testified consistent with his above Affidavit. (Document No. 172-1.) Specifically, Plaintiff testified, in penitent part, as follows:

> Q.    Officer Hudson says that immediately upon his entrance into your pod area, he found you to be yelling, 'Start cleaning up that water whore, you need to do what I said, whore.' That's Officer Hudson's words. Do you agree with that?
>
> A.    No, I do not.
>
> Q.    So you dispute what Officer Hudson said, that you said, upon his appearance at your pod?
>
> A.    Yes.
>
> Q.    Officer Hudson also says that he warned you at least two or three, perhaps more – I seem to see at least two or three times here – that he kept telling you to be quiet, or else there were going to be consequences. Do you dispute that?
>
> A.    Yes.
>
> Q.    So you don't agree with any of Officer Hudson's explanations that he says took place before you were sprayed?
>
> A.    No. He sprayed me without warning, and then called me a Jewish motherf**cker.
>
> *   *   *
>
> Q.    How did he go about spraying you? You were still inside your cell. How did he go about spraying you to where it affected you?
>
> A.    There was some kind of object that was placed under my door, and when I

looked at it, that's when a fog-like mist started covering my body.

\* \* \*

Q.    And he also said that by you continuing to say things verbally, you were escalating an already explosive situation that was going on in that pod with Ramsey and Smith that they had already brought under control.

A.    Which I believe was somewhere probably around an hour to two hours later.

Q.    Okay.

A.    So the incident was no longer - - it was resolved. They turned their water off, and it was between an hour and two hours later.

\* \* \*

Q,    But [Hahn, Hess, Hypes, Boychuck and Wimmer] didn't personally do anything to you directly?

A.    Besides after I was sprayed and Hudson called me a "Jewish motherf\*\*cker," and Hypes called me a "kike," and used some kind of - - in some type of form.

\* \* \*

Q.    [Hypes] is the only one of the other collection of officers that you contend did something else to you?

A.    Yes. After I was sprayed and I was left in there for somewhere between - - let me look at my records to see what the time was. Somewhere between 10 and 25 minutes after I was sprayed, I was hitting my call button asking for help, and he came in with a large gun and opened my bean hole. And when I told him to help me, and I begged for help, he told me to, "Shut the f\*\*ck up," and that he was about to "f\*\*ck me up."

Q.    This is Hypes?

A.    Yes. While this was occurring, Hypes - - or Hess was down the tier on the top of the steps watching everything and he failed to say anything. And I believe the policy is that once you are sprayed with these chemical agents, a verbal [command] for you to cuff up is supposed to be given, which was not ever given to me.

19

(Id., pp. 12, 14, 18, and 19.)

## STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for

violations of federally protected civil rights." <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

1.    **<u>Excessive Force</u>:**

As a general matter, punishments prohibited under the Eighth Amendment include those which "involve the unnecessary and wanton infliction of pain." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(<u>quoting</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." <u>Wolfish v. Levi</u>, 573 F.2d 118, 125 (2d Cir. 1978), <u>rev'd on other grounds</u>, <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In the context of prison officials' use of force upon an inmate, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986)(citations omitted); <u>also see</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 130 S.Ct. 1175, 178, 175 L.Ed.2d 995 (2010). To establish a violation of the Eighth Amendment in the context of a challenge to prison officials' use of force, an inmate must allege (1) that the prison officials acted with a "sufficiently culpable state of mind" under a subjective standard and (2) a "sufficiently serious" injury under an objective standard.

Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 2323-25, 115 L.Ed.2d 271 (1991); also see

Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008).

   To establish the subjective component, an inmate must demonstrate that prison officials

applied force "maliciously and sadistically for the very purpose of causing harm." Whitley, 475

U.S. at 320-21, 106 S.Ct. at 1085. In determining whether prison officials acted maliciously and

sadistically, the following factors must be balanced: (1) "the need for application of force," (2)

"the relationship between that need and the amount of force used," (3) "the threat reasonably

perceived by the responsible officials," and (4) "any efforts made to temper the severity of a

forceful response." Iko, 535 F.3d at 239(citing Whitley, 475 U.S. at 321, 106 S.Ct. at 1078).

Additionally, the absence of serious injury is relevant to the determination of prison officials'

culpable intent, but is not dispositive. Id. Although every "malevolent touch" by a prison guard

will not give rise to a federal cause of action, "[a]n inmate who is gratuitously beaten by guards

does not lose his ability to pursue an excessive force claim merely because he has the good fortune

to escape without serious injury." See Wilkins, 559 U.S. at 38, 130 S.Ct. at 1179; Hudson v.

McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992).

   Concerning the objective component, the focus is "not on the severity of any injuries

inflicted, but rather on 'the nature of the force,' which must be 'nontrivial.'" Wilkins, 559 U.S. at

40, 130 S.Ct. at 1179("The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury

was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm.'"); also see Hill v. Crum, 727 F.3d 312,

321 (4th Cir. 2013)("[T]he nature of the force, rather than the extent of the injury, is the relevant

inquiry.") The "absence of serious injury," however, is not irrelevant to the inquiry. Id., 559 U.S. at

37, 130 S.Ct. at 1178(citing <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. at 995). The extent of an inmate's injury may (1) "suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation," and (2) "provide some indication of the amount of force applied." <u>Id.</u>(citations omitted). 'The Eighth Amendment's prohibition . . . necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of the sort repugnant to the conscience of mankind." <u>Harris v. Salley</u>, 339 Fed.Appx. 281, 284 (4th Cir. 2009), <u>citing Hudson</u>, 503 U.S. at 9 - 10, 112 S.Ct. at 1000. "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." <u>Wilkins</u>, 559 U.S. at 38, 130 S.Ct. at 1178(citations omitted). The objective component standard, however, is significantly less demanding than required in the context of challenges to conditions of confinement because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. at 1000 ("This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.") Thus, the objective component is "responsive to contemporary standards of decency." <u>Id.</u>

In their Motion for Summary Judgment, Defendants argue that Plaintiff's claim of excessive force should be dismissed because the spraying of Plaintiff with OC was applied in good faith to restore order.[5] (Document No. 170, pp. 8 - 15.) Citing the factors set forth in <u>Whitley</u>, Defendants argue that the factors weigh in favor of finding that force was used in a good faith effort to restore order and not done so maliciously and sadistically for the purpose of causing harm.

---

[5] Defendants' Motion for Summary Judgment only addresses Plaintiff's claim of excessive force concerning the use of OC spray on September 1 and 2, 2013. To the extent Plaintiff is alleging excessive force occurring on September 30, 2013, Defendants do not address this allegation of excessive force.

(Id.) First, Defendants state that Plaintiff's "continuous yelling could only exacerbate an already explosive situation for correctional officers who were dealing with two inmates that had flooded their cells causing tremendous amounts of water to be spilled throughout the pod and Day Room." (Id., p. 10.) Second, Defendants state that "Officer Hudson's use of Oleoresin Capsicum to quiet [Plaintiff] and to bring the disturbance under control was an intermediate tactic which would be characterized as 'soft' to gain [Plaintiff's] compliance." (Id.) Defendants conclude that "[t]here can be no doubt that [Plaintiff's] remarks could further incite the two disturbances that were just being brought under control." (Id.) Defendants state that Plaintiff's "continuous yelling could well have incited additional flooding or other more serious disturbances." (Id., p. 11.) Defendants argue that "[s]ubjecting [Plaintiff] to the soft control measure of being sprayed with Oleoresin Capsicum was absolutely necessary to temporarily impair [Plaintiff] as he would not follow a correctional officer's warning to cease and desist from yelling." (Id., p. 10.) Defendants conclude that spraying Plaintiff with OC "under these circumstances helped to preserve internal order and discipline and restore institutional security without significant delay." (Id., p. 11.) Finally, Defendants argue that Plaintiff "cannot produce any evidence that he suffered anything more than temporary irritation from the use of Oleoresin Capsicum." (Id., p. 12.) Defendants contend that Plaintiff did not require any medical treatment other than basic decontamination and a subsequent shower. (Id.) Defendants cite multiple cases arguing that the use of pepper spray was a reasonable use of force. (Id., pp. 13 - 15.) The majority of these cases, however, involve inmates that were out of their cells and in close proximity to correctional officers creating an immediate safety issue for the officers. (Id.)

In Response, Plaintiff argues that Defendant Hudson "maliciously and sadistically used

force against [Plaintiff] to cause harm. (Document No. 173, pp. 11 - 16.) Plaintiff contends that he

was sprayed with OC approximately two hours after the incident with Inmates Smith and Ramsey

had been resolved. (Id.) Plaintiff argues that Defendant Hudson returned to the pod with a "canister

of phantom OC spray" with the intent of causing harm. (Id.) Plaintiff contends that when

Defendant Hudson entered the pod, he ordered that the water be shut off. (Id.) Plaintiff argues that

once the water was off, which was two hours after the incident involving Inmates Smith and

Ramsey, Defendant Hudson went through the pod asking inmates if they wanted to be "sprayed."

(Id.) Plaintiff disputes that he was yelling obscenities or that Defendant Hudson ordered him to be

quite. (Id.) Plaintiff states that he was merely quoting the Constitution "explaining to Hudson that

he could not just spray inmates at will." (Id.) Plaintiff contends that Defendant Hudson "became

overly aggressive telling Hypes that he was 'going to spray that Jew Bastard." (Id.) Plaintiff

explains that Defendant Hudson "immediately went upstairs to Douty's cell and without any

commands or warning placed a wand attached to phantom OC spray under the door deploying one

single burst lasting 4 - 7 seconds long." (Id., p. 13.) Plaintiff argues that Defendant Hudson used

"antisemitic hate crime language both before and after using force." (Id., p. 14.) Plaintiff further

notes that Defendant Hudson's use of a single burst of OC spray lasting 4 - 7 seconds exceeded

manufacturer instructions. (Id.) Further, Plaintiff states that Defendants left Plaintiff in his cell

covered with OC spray for 40 to 50 minutes before taking him for decontamination. (Id.) Plaintiff

asserts that he "suffered first-degree chemical burns on partial areas of his face, abdomen, arms,

legs and thighs causing blister, a rash, and an orange colored pus to ooze from the wounds, which

has now turned to scars." (Id., p. 15.) Therefore, Plaintiff argues that "construing the facts in the

light most favorable to [him], the force used by Hudson was not made in a good faith effort to

maintain or restore order, but maliciously and sadistically applied for the purpose to cause harm." (Id.)

In Reply, Defendants argue that "officers in the Quilliams II Unit are 'not required to utilize confrontation avoidance measure before applying Oleoresin Capsicum or any other appropriate force." (Document No. 184, p. 4.) Defendants continue to argue that even though Defendant Hudson was not required to do so, Defendant Hudson did warn Plaintiff several times prior to deploying the OC spray. (Id., p. 5.) Defendants assert that there is nothing to suggest that the spraying of Plaintiff was done maliciously, sadistically or intentionally to cause harm. (Id.) Defendants argue that "the plain weight of the evidence set forth in the Incident Reports and Use of Force Committee Report establish that the spraying of Inmate Douty was to quell what had become a serious disturbance causing significant flooding damage, and in addition to caution and act as a deterrence to other inmates similarly situated so that they would not seek to join in the disturbance and bring about the possibility of physical injury to other inmates or destruction of state property." (Id.) Next, Defendants state that the alleged use of disparaging language by Defendants "did not amount to hate crimes as [Plaintiff] suggests." (Id.) Defendants argue that there is no evidence that Plaintiff was sprayed because he was a member of Jewish faith, but only to "quell a serious prison disturbance." (Id., p. 6.) Concerning Plaintiff's alleged first-degree chemical burns, Defendants argue that Plaintiff's medical records only "reveal nurse's notes that [Plaintiff] alleges he sustained chemical burns." (Id.) Defendants argue that Plaintiff has no visible scarring. (Id.) Defendants note that during Plaintiff's video deposition, Plaintiff stated that the scarring was not visible because he had a sun tan due to his recent release into general population. (Id., pp. 7 - 8.) Concerning Plaintiff's statement that he was sprayed with OC longer than necessary

26

and left in his cell for 40 - 50 minutes, Defendants argue that the "Incident Report and Committee Report do not corroborate [Plaintiff's] opinion." (Id., p. 9.) Defendants argue that "[t]he Use of Force Committee Report attached to Captain Brian Penick's first affidavit also corroborates that Officer Hudson sprayed [Plaintiff] with two one-second bursts of Oleoresin Capsicum from an MK-IX Cell Buster under [Plaintiff's] door for area saturation." (Id.) Finally, Defendants conclude that they have satisfied all factors set forth in Whitely. (Id., pp. 11 - 12.)

Regarding the first Whitely factor, the undersigned finds that there are genuine issues of material facts as to the need for the application of force. Viewing the facts in a light most favorable to Plaintiff, a jury could reasonably find that there was no need for the application of force. Plaintiff contends that two hours after the incident involving Inmates Smith and Ramsey was resolved, Defendant Hudson began threatening to spray inmates with OC after the water supply for pod 4 had been shut off. Plaintiff states that he was quoting the Constitution during this time and telling Defendant Hudson that such conduct would be unlawful. Without being instructed to cease his conduct, Plaintiff states that Defendant Hudson immediately ran up the steps and sprayed him with OC spray. See Glascoe v. Sowers, 2013 WL 5330503, * 6 (D.Md. Sept. 20, 2013)(stating "Eighth Amendment violations have . . . been found when a chemical agent was used without a prior verbal command, or after a prisoner had been subdued or had become complaint with an officer's instructions.") Plaintiff attaches sworn statements from seven inmates, which supports Plaintiff's version of the above facts. Defendants, however, argue that Plaintiff was yelling disparaging comments and force was necessary to restore order. See Henslee v. FNU Singleton, 2015 WL 4920260, * 5 (W.D.N.C. Aug. 18, 2015)("A correctional officer uses excessive force if he approaches a prisoner and, without any provocation by the prisoner aside from verbal taunts,

sprays pepper spray into the prisoner's face.") Although Defendants argue that Plaintiff's "continuous yelling *could well have* incited additional flooding or other more serious disturbances," Plaintiff presents evidence that the water supply to pod 4 had been shut off prior to Defendant Hudson spraying him with OC spray. (Document No. 170, p. 11.)(emphasis added). If the water was shut off as Plaintiff contends, there was no danger that flooding would occur. Defendants further argue that Plaintiff was "exacerbating the situation by shouting obscenities at the officers while they tried to bring an already inflammatory situation under control." Plaintiff, however, presents evidence that he was only quoting the Constitution and there was no ongoing inflammatory situation to control. In making the decision to use force to "quell prison disturbances," prison officials "must take into account the very real threats the unrest present to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used." Whitley, 475 U.S. at 320, 106 S.Ct. at 1085. In the instant case, there is no evidence that any inmate in pod 4 was out of their cell, that flooding was occurring, or that any other inmate was yelling or engaging in disruptive conduct. Wilson v. Hudson, 2015 WL 4978724 (S.D.W.Va. July 30, 2015)(finding the first *Whitley* factor to be satisfied where it was undisputed that plaintiff failed to comply with direct orders, plaintiff's action of banging on his door and yelling across the pod contributed to a disturbance in the pod, and prevented correctional officers from carrying out their pressing duties of searching each cell for weapons and contraband).

Furthermore, Plaintiff presents evidence that Defendant Hudson used derogatory language towards Plaintiff and stated that he did not need a reason to spray Plaintiff with OC spray. See Orem v. Rephann, 523 F.3d 442, 447 (4th Cir. 2008)(comments or actions by a defendant that indicate a malicious motive are relevant to the subjective inquiry in an Eighth Amendment claim),

28

abrogated on other grounds, Estate of Armstrong v. Village of Pinehurst, 810 F.3d 892 (4th Cir. 2016); Blount v. Collins, 2013 WL 4084764, * 4 (W.D.Va. Aug. 13, 2013)(finding that the evidence construed in a light most favor to plaintiff permitted a reliable inference that defendant maliciously applied pepper spray to inflict pain where plaintiff, while confined in this cell, merely asked to speak to another officer and not posing any immediate threat.) Thus, it is far from clear from the record whether there was an ongoing disturbance and a credible threat of an impending disturbance. The undersigned acknowledges that Defendants present evidence supporting Defendant Hudson's version of the events. Specifically, Defendants present the Affidavit of Defendant Hudson, the Affidavit of Captain Penick, a copy of the Incident Report regarding the "Spontaneous Use of Force" (Incident Report No. 13-4989), a copy of Incident Reports charging Plaintiff with Creating a Disturbance, Insubordination/Insolence, and Refusing an Order on September 2, 2013 (Incident Report Nos. 13-14986, 13-4987, 13-4988), and a copy of the "Use of Force Report." (Document Nos. 169-3, 169-4, and 169-5.) Although the foregoing documents are consistent with Defendant Hudson's version of the events, it is important to note that the four Incident Reports were prepared by Defendant Hudson and Captain Penick was not present during the events in dispute. Concerning the "Use of Force Report," it is unclear what evidence was considered by the Committee. Based on the foregoing, the undersigned concludes that there are genuine issues of material fact as to whether there was a need for Defendant Hudson's application of force.

Considering the second Whitely factor, the undersigned finds that there are genuine issues of material facts as to the relationship between the need for the application of force and the amount of force used. Since the undersigned has found issues of fact concerning whether there was a need

29

for the application of force, the Court also finds issues of facts as to whether the amount of force was unnecessary. Tedder v. Johnson, 527 Fed.Appx. 269, 273 (4th Cir. 2013)(Since the facts "permit the conclusion that no force was necessary at all, the *Whitley* 'amount of force' factor favors [plaintiff] as well.") Although Defendants contend that Plaintiff was sprayed with two one-second bursts of OC spray, Plaintiff argues that he received a 4 to 7-second burst of OC spray. A copy of the product label for "Phantom OC" by Sabre warns as follows: "Do no discharge at distances of less than 6 feet – may cause injuries to soft body tissue. If you are unable to restrain the subject after 2, 1 to 3 second bursts, employ the next appropriate force option." (Document No. 172-3, p. 64.) It is well established that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or chemical agents "in quantities great than necessary or for the sole purpose of infliction of pain." Iko, 535 F.3d at 240(citations omitted). Based upon the foregoing, the undersigned finds there are genuine issues of material facts as to the relationship between the need for the application of force and the amount of force used by Defendant Hudson.

Considering the third Whitely factor, the undersigned finds that there are genuine issues of material facts as to the existence of any reasonably perceived threat that the application of force was intended to quell. When considering the above factor, it is relevant to consider an inmate's undisputed history. Harper v. Blagg, 2015 WL 6509131, * 10 (S.D.W.Va. Oct. 28, 2015)(J. Johnston). It is undisputed that Plaintiff is currently serving a life sentence for first degree murder, with the recommendation of mercy, and he was placed in the Quilliams II Unit due to various rule violations such as "exposing body fluids, assault with a weapon or gas, and various other minor incidents." Despite Plaintiff's history, there is no allegation by Defendants that the use of force was necessary because they felt physically threaten by Plaintiff. Defendants contend that the use of

force was necessary to quell the threat to the order and security of Quilliams II because Plaintiff "created a disturbance and refused an order in the midst of a volatile situation." As explained above in the consideration of the first <u>Whitely</u> factor, the undersigned finds there are issues of fact concerning (1) whether Plaintiff was creating a disturbance or refusing an order, and (2) whether the foregoing occurred in the midst of a volatile situation or during a period of unrest within the pod. When construing the record in the light most favorable to Plaintiff, the record indicates that Plaintiff did not present a threat at the time Defendant Hudson sprayed him with OC spray. There is no evidence that any inmate in pod 4 was out of their cell, that flooding was occurring, or that any other inmate was yelling or engaging in disruptive conduct. Based on the foregoing, the undersigned finds that there are genuine issues of material fact as to the above <u>Whitely</u> factor.

Considering the final <u>Whitely</u> factor, the undersigned finds that there are genuine issues of material facts as to any effort to temper the severity of a forceful response. Defendants argue that Defendant Hudson did temper his response by using two one-second bursts of OC spray because he could have "employed a taser, a pepper ball projectile or a bean bag fired from a shot gun." (Document No. 184, p. 12.) Plaintiff argues that Defendant Hudson could have tempered his response by giving Plaintiff verbal orders to be quite. Plaintiff states that he would have complied with such an order had it be given by Defendant Hudson. <u>Tedder</u>, 527 Fed.Appx. at 273(finding no evidence of an attempt to temper where only a small amount of mace was used "given that none was required at all to force compliance from an inmate.") As stated above, there is an issue of fact as to whether Defendant Hudson gave Plaintiff such an order prior to deploying the OC spray. Plaintiff further argues that MOCC was under "martial law" meaning that correctional officers could control the inmate population "with levels of force not normally authorized by law."[6]

---

[6] The undersigned has thoroughly reviewed the audio recording concerning Inmate Mullins' disciplinary hearing.

(Document No. 173, p. 10.) Defendants dispute the existence of such a policy, but acknowledge that "officers in the Qulliams II Unit are 'not required to utilize confrontation avoidance measures before applying Oleoresin Capsicum or any other appropriate force." (Document No. 184, p. 4.) Furthermore, it is appropriate under the above factor to consider whether Plaintiff was provided with timely decontamination. <u>Mann v. Scott</u>, 2015 WL 5165198, * 5 (D.S.Ct. Sept. 1, 2015)("Courts have found that the question of whether a prisoner was sufficiently decontaminated following the use of pepper spray or mace is a significant factor upholding the use of mace"). The undersigned finds there is an issue of fact concerning whether Plaintiff was provided with timely decontamination. Construing the facts in a light most favorable to Plaintiff, Plaintiff was not removed from his cell for approximately 30 to 50 minutes after he was sprayed with OC. Although Defendant Hudson and the Incident Report's prepared by Defendant Hudson indicate that Plaintiff was removed from his cell for decontamination approximately 16 minutes after the OC spray was deployed, Plaintiff attaches several sworn statements from inmates stating 30 to 50 minutes passed before Plaintiff was taken for decontamination. Therefore, the undersigned finds that there are issues of fact as to whether Defendant Hudson engaged in efforts to temper the severity of a forceful response. Based upon the foregoing, the Court finds that there are genuine issues of material fact as to the subjective component – whether Defendant Hudson applied force "maliciously and sadistically for the very purpose of causing harm."

Next, the undersigned will consider the objective component. Although Defendants argue that Plaintiff did not suffer any serious injury from the deployment of the OC spray, Defendants do

---

The audio recording reveals that when C.O. Patterson was questioned regarding the policy of correctional officers using pepper spray on inmates who kick their cell doors, C.O. Patterson stated that "there is marital law going on right now." C.O. Patterson explained that the Warden directed correctional officers to use pepper spray to stop inmates from kicking their cell doors. C.O. Patterson further explained that because Inmate Mullins was a "better than average inmate," correctional officers did not spray him with pepper spray the first time Inmate Mullins kick the door even though they were under martial law. (Document No. 125.)

not appear to dispute that the OC spray causes adverse effects. Plaintiff alleges that he suffered "first-degree chemical burns on partial areas of his face, abdomen, arms, legs and thighs causing blisters, a rash, and an orange colored pus to ooze from the wounds, which has not turned to scars." (Document No. 173, p. 15.) "Courts previously found that similar adverse physical reactions to pepper spray or other chemical munitions were sufficient to create genuine issues of material fact as to the objective inquiry of an excessive force claim." See Harper, 2015 WL 6509131, * 12(citation omitted). The undersigned, therefore, finds that the evidence concerning Plaintiff's physical reaction to the OC spray creates a genuine issue of material fact as to whether the nature of force used by Defendant Hudson was nontrivial. See Tedder, 527 Fed.Appx. at 274("Tedder's adverse physical reaction to the pepper spray – gagging, breathing difficulty, and vomiting – establishes that the nature of the force Sgt. Johnson used against Tedder was nontrivial."); Peyton v. Clark, 2014 WL 4657802, * 6 (W.D.Va. Sept. 16, 2014)(finding that plaintiff's exposure to OC spray and puncture wounds from a K9 bite were objectively harmful enough to satisfy the objective prong of the Eighth Amendment); Blount, 2013 WL 4084764 at *4(finding that plaintiff's claim that the pepper spray caused breathing problems, chest pain, and a painful burning sensation in his eyes, nose, and skin that lasted for some time after the attempted decontamination in the shower was sufficient to present a genuine issue of fact for trial on the objective component of his excessive force claim). Accordingly, it is respectfully recommended that Defendants' Motion for Summary Judgment concerning Plaintiff's claim of excessive force occurring on September 1 and 2, 2013, be denied. See Boone v. Stallings, 583 Fed.Appx. 174, 176-77 (4th Cir. 2014)("A jury could find that the amount of force used by the officers was not justified if they accepted Boone's allegations that he was not acting belligerently and that the officers beat him and

deployed pepper spray for some other reason than to maintain or restore discipline – for example, in retaliation for using vulgar language.")

## 2.    Qualified Immunity:

In their Motion for Summary Judgment, Defendants argue that Plaintiff's "claims are barred against all of the Defendants by the doctrine of qualified immunity." (Document No. 170, p. 16.) Specifically, Defendants assert that they are entitled to qualified immunity because Officer Hudson was performing a discretionary function and "it is clear that Officer Hudson sprayed [Plaintiff] for the purpose of gaining compliance of [Plaintiff] to stop him from yelling and refusing the basic commands of a correctional officer." (Id.) Defendants state that "[t]he decision to spray [Plaintiff] was a good faith effort to restore order, and as such [Plaintiff's] claims of excessive force and violation of the Eighth Amendment must fail." (Id.) Therefore, Defendants argue "the Plaintiff cannot present evidence that a clearly established right was violated." (Id.)

In Response, Plaintiff argues his "claims are not barred against all of the Defendants by the defense of qualified immunity." (Document No. 173, pp. 17 - 18.) Plaintiff argues that "there were clearly established statutory or constitutional rights in place of which a reasonable person would have known." (Id., p. 18.) Plaintiff argues that MOCC Policy Directive 325.00 and 2.30 of the prison handbook are not 'clearly established law' for qualified immunity purposes. (Id.) Therefore, Plaintiff contends that Defendants are not entitled to qualified immunity. (Id.)

Courts have established qualified immunity for government officials in consideration of a number of factors including the substantial cost of litigation against government officials, the distraction of government officials from their public responsibilities and the disincentive to responsible and capable persons to accept government positions if there is no protection against

34

suits accusing them of misconduct in the performance of their public duties. Government officials performing discretionary functions are generally protected from civil damages liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In determining the validity of a qualified immunity defense, the Court should be guided by a two-prong test: (1) whether the facts viewed in the light most favorable to the Plaintiff establish a deprivation of an actual constitutional right; and (2) whether that right was clearly established at the time of the purported violation. Id. The sequence of the steps is immaterial following Pearson. The Court may exercise discretion in deciding which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." Id. at 818. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 *4th Cir. 2013)(internal quotation marks and citations omitted).

The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishment." It is well recognized that "[i]n its prohibition of 'cruel and unusual punishments,'the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). It has been clearly established since 1996 that it is a violation of the Eighth Amendment for prison officials to use chemical agents against inmates in quantities greater than necessary or for the sole purpose of inflicting pain. See Iko, 535 F.3d at 240(citing Williams, 77 F.3d at 763). In 2010, the United States Supreme Court held that the use of

35

excessive physical force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. Wilkins, 559 U.S. at 38 - 39, 130 S.Ct. at 178. The Wilkins' decision overruled the Fourth Circuit's precedent that excessive force claims based solely on a *de minimis* injury were not legally viable. Id.; also see Hill,727 F.3d at 316. Thus, at the latest, the status of law prohibiting the use of force was settled as of 2010. Accordingly, the undersigned finds that Plaintiff's right to be free from the excessive use of force and the excessive use of pepper spray was clearly established at the time of the alleged incident in September, 2013. As explained above, the undersigned has concluded there are issues of material fact regarding Defendant Hudson's use of OC spray on Plaintiff. When both the resolution of the qualified immunity question and the case itself depends upon a determination of what actually happened, summary judgment on grounds of qualified immunity is not proper. Buonocore v. Harris, 65 F.3d 347, 359 (4th Cir. 1995); Hinojos v. Bowers, 2015 WL 4878812, * 8 (D.S.C. Aug. 14, 2015)(citations omitted)("[T]he court holds that there is a genuine issue of material fact as to whether [the defendant] used excessive force against [plaintiff]; therefore, the court cannot determine at the summary judgment phase that [the defendant's] actions were objectively reasonable for purposes of granting qualified immunity.") Accordingly, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment based upon qualified immunity be denied.

**3.      Supervisor Liability:**

In their Motion for Summary Judgment, Defendants argue that Defendant Hudson's superior officers were not indifferent and did not violate Plaintiff's constitutional rights. (Document No. 170, pp. 16 - 17.) Citing Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994),

Defendants argue that supervisors can only be "held liable for the constitutionally offensive actions of their subordinates in circumstances where a supervisor by its own conduct was deliberately indifferent to, or tacitly approved, prior constitutional violations." (Id.) Defendants argue that "Plaintiff cannot show that the force used against him by Officer Hudson was excessive." (Id.) Defendants, therefore, conclude that because Plaintiff "cannot present sufficient evidence to support a claim of deliberate indifference against Officer Hudson, it follows that [Plaintiff] cannot demonstrate that Officer Hudson's superior officers were indifferent and violated his constitutional rights herein when he was sprayed with Oleoresin Capsicum." (Id.)

In Response, Plaintiff argues that Defendants Rubenstein and Ballard are the only individuals who have responsibilities and authority to create and enforce policies or customs at MOCC. (Document No. 173, pp. 8 - 10.) Plaintiff contends that "Rubenstein and Ballard have created and implemented a policy or custom known a Martial Law: No Efforts to Temper in Segregation." (Id., pp. 8 - 9.) Plaintiff argues that the above "policy or custom is confirmed by a Unit Team Request Form signed by Lt. Brian Penick." (Id.) Specifically, Plaintiff states that the Unit Team Request Form stated "Per Warden, Martial Law is a tool that MOCC utilizes." (Id.) Additionally, Plaintiff states that "Correctional Officer Jim Patterson explained to a hearing officer that Williams said, 'the Warden ordered martial law . . . and told us to give them . . . the business." (Id., p. 9.) Plaintiff argues that Defendants Rubenstein and Ballard were clearly aware of the policy or custom of "no efforts to temper in segregation." (Id.) Plaintiff explains that "[u]nder the theory of martial law, subordinates can use force on inmates locked alone in single-man cells for using obscenities when talking." (Id.) Plaintiff concludes that "while Rubenstein and Ballard were not present at the attack, they can be held liable for the constitutionally offensive actions of their

subordinates in circumstances where their own conduct was deliberately indifferent to, or tacitly approved, prior constitutional violations." (Id.)

In Reply, Defendants dispute that there was a policy or custom of martial law. (Document No. 184.) Defendants further argue that the Unit Team Request Form submitted by Inmate Smith on August 26, 2013, is a forgery. In support, Defendants attach the following: (1) A copy of Inmate Roger Smith's "Unit Team Request Form Qulliams 2" dated August 26, 2013 (Document No. 184-1.); (2) A copy of the Affidavit of Warden Ballard (Document No. 184-2.); and (3) A copy of the Affidavit of Captain Brain Penick (Document No. 184-3.).

In Response, Plaintiff filed a "Motion for Leave to Amend and/or Supplement Roger Dwayne Smith's Affidavit." (Document No. 188.) As an Exhibit, Plaintiff attaches a copy of Inmate Roger Dwayne Smith's Amended Affidavit stating that the "Unit Team Request Form Qulliams 2" is not a forgery. (Document No. 188-1.) Specifically, Inmate Smith states that the above form has Q2 stamp in the upper right hand corner identifying that it was received by the unit team and inmates in Quilliams have no way to reproduce such a stamp. (Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. * * * Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the officials own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1936, 1948, 173 L.Ed.2d 868 (2009); see also Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001), cert. denied, 537 U.S. 1045 , 123 S.Ct. 621, 154 L.Ed.2d 517 (2002)("In a Bivens suit there is no *respondeat superior* liability. * * * Instead, liability is personal, based upon each defendant's own constitutional violations." (Citation omitted.)); Monell v. Department of

Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)("the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability"). Liability can be premised, however, "on a recognition that supervisory indifference or 'tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). To establish liability under Section 1983 for a supervisory defendant, the plaintiff must establish the following:

> that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Thus, a plaintiff must show "a pervasive and unreasonable risk of harm from some specified source and that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" Slakan, 737 F.2d at 373. Evidence of a supervisor's continued inaction in the face of documented widespread abuses provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates. Id. A supervisor's mere knowledge of a subordinate's unconstitutional conduct is not enough. Rather, Section 1983 liability may be imposed upon a supervisor only on the basis of purposeful "violations of his or her supervisory responsibilities." Ashcroft, 556 U.S. at 676, 129 S.Ct. at 1949.

First, the undersigned will consider Plaintiff's claims against Commissioner Rubenstein,

Associate Warden Perry, Captain Williams, and Lieutenant Hahn. Concerning Defendants Rubenstein, Perry, Williams, and Hahn, Plaintiff fails to present any evidence of actual or constructive knowledge of their subordinate's alleged misconduct. To the extent, Defendants Rubenstein, Perry, Williams, and Hahn may have responded to an administrative remedy filed by Plaintiff, such is insufficient. The dismissal of a defendant is appropriate where the defendant's sole involvement in an action is related to the administrative remedy process. See Fellove v. Heady, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state *Bivens* claim"); Mabry v. Ramirez, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a *Bivens* claim for deliberate indifference to serious medical needs"); Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003), aff'd, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). The undersigned finds that Plaintiff has failed to specify any action taken by Defendants Rubenstein, Perry, Williams, and Hahn that violated Plaintiff's constitutional rights. Accordingly, Plaintiff has improperly raised his claim against Defendants Rubenstein, Perry, Williams, and Hahn under the doctrine of *respondeat superior* and his above claims should be dismissed.

Second, the undersigned will consider Plaintiff's claims against Defendant Ballard. To the extent Defendant Ballard claims he is entitled to summary judgment because "Plaintiff cannot show that the force used against him by Officer Hudson was excessive," such an argument should

be denied. As explained above, the undersigned has concluded that there are issues of material facts concerning whether Defendant Hudson used excessive force. Additionally, the undersigned finds there are material issues of fact as to whether Defendant Ballard authorized the use of "martial law." Construing the evidence in a light most favor to Plaintiff, the undersigned finds evidence exists indicating that Defendant Ballard was aware of an unreasonable risk of harm or misconduct by Defendants and failed to take corrective action. Although Defendants dispute the validity of the document, Plaintiff submits a copy of an "Unit Team Request Form" wherein Captain Penick allegedly responds "Per Warden, Martial Law is a tool that MOCC utilizes." (Document No. 172-3, p. 22.) In an audio recording concerning Inmate Mullins' disciplinary hearing, the recording reveals that when C.O. Patterson was questioned regarding the policy of correctional officers using pepper spray on inmates who kick their cell doors, C.O. Patterson stated that "there is marital law going on right now." (Document No. 125.) C.O. Patterson explained that the Warden directed correctional officers to use pepper spray to stop inmates from kicking their cell doors. (Id.) C.O. Patterson further explained that because Inmate Mullins was a "better than average inmate," correctional officers did not spray him with pepper spray the first time Inmate Mullins kick the door even though they were under martial law. (Id.) Construing the record in a light most favorable to Plaintiff, the record indicates that Defendant Ballard was aware that subordinates were deploying OC spray and using force without making any efforts to temper, such as directing the inmate to cease the alleged misconduct. See Tedder, 527 Fed.Appx. at 273(finding no evidence of an attempt to temper even where only a small amount of mace was used because "none was required at all to force compliance from an inmate."); Boone, 583 Fed.Appx. at 176-77("A jury could find that the amount of force used by the officers was not justified if they

accepted Boone's allegations that he was not acting belligerently and that the officers beat him and deployed pepper spray for some other reason than to maintain or restore discipline – for example, in retaliation for using vulgar language.") Based on the foregoing, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment be denied as to Defendant Ballard and granted as to Defendants Rubenstein, Perry, Williams, and Hahn.

**4.    Deliberate Indifference:**

In their Motion for Summary Judgment, Defendants argue that "Plaintiff has failed to offer any evidence that he was denied medical attention for serious medical need by Officer Hudson or any of the other Defendants named herein in violation of the Eighth Amendment." (Document No. 170, pp. 17 - 18.) First, Defendants argue that Plaintiff failed to produce any evidence that "he was inflicted with a serious medical injury as a result of being sprayed with Oleoresin Capsicum." (Id., p. 17.) Defendants state that "[a]lthough Plaintiff received medical treatment after being sprayed with Oleoresin Capsicum which could be considered evidence of a sufficiently serious injury, Plaintiff cannot provide the Court with any evidence that the Defendants knowingly disregarded any excessive risk to [Plaintiff's] health or safety." (Id.) Defendants argue that Plaintiff only "suffered skin irritation and a burning sensation that anyone is subjected to when they are sprayed with this particular chemical agent." (Id.) Defendants assert that they "reasonably responded to this risk by decontaminating [Plaintiff] immediately after he was sprayed with Oleoresin Capsicum." (Id., p. 18.) Defendants conclude the "only harm suffered by [Plaintiff] consisted of temporary discomfort and a burning sensation as a result of a proper use of force to gain compliance due to the Plaintiff's refusal to obey orders." (Id.)

In Response, Plaintiff argues that he was "left in his cell covered with OC spray for around

40 - 50 minutes before being removed and decontaminated, which caused first-degree chemical burns. (Document No. 173, pp. 2 and 7.) Plaintiff contends that during this time he "experienced respiratory problems . . ., extreme burning of the skin, eyes, nose, and throat." (Id., p. 7.) Plaintiff asserts that his first-degree chemical burns could have been avoided if Defendants would have immediately removed him from his cell. (Id.)

In Reply, Defendants argue that "the problem with [Plaintiff's] medical records, however, is that no physician has ever made a specific diagnosis that [Plaintiff] indeed sustained first-degree chemical burns." (Document No. 184, p. 6.) Defendants explain that Plaintiff's medical records only include nurse's notes. (Id.) Defendants argue that the redness and skin irritation was "likely due to [Plaintiff's] continued scratching." (Id.) In his Affidavit, Captain Penick states that he reviewed Plaintiff's decontamination video and Plaintiff "did not display injuries of any kind from being sprayed." (Id.) Captain Penick further states that "he is personally not aware of any inmate who has sustained burns of any kind when sprayed with Oleoresin Capsicum." (Id.) Finally, Defendants argue that Plaintiff has no visible scarring. (Id., pp. 7 - 8.) Defendants claim that during Plaintiff's video deposition, Plaintiff acknowledges that his alleged scars are difficult to see because he now has a sun tan. (Id.)

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the

43

minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392). "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of

delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979.

First, the undersigned will consider the objective component. In their Motion, Defendants cite case law acknowledging that "[p]epper spray is designed to cause intense pain, a burning sensation that causes mucus to come out of the nose, and involuntary closing of the eyes, a gagging reflex, and a temporary paralysis of the larynx."[7] (Document No. 170, p. 14.) Thus, the Court finds that Plaintiff suffered from an objectively serious medical need after being sprayed with OC spray. Next, the undersigned will consider the subjective component. The Court finds that there are material issues of facts concerning whether Defendants acted with deliberate indifference in providing medical treatment/decontamination following the deployment of OC spray. Construing

---

[7]   A copy of the product label for "Phantom OC" by Sabre states that "some effects may include coughing, choking, gagging, difficulty breathing, vomiting." (Document No. 172-3, p. 64.)

the facts in a light most favorable to Plaintiff, Plaintiff was not removed from his cell for approximately 30 to 50 minutes after he was sprayed with OC. Although Defendant Hudson's Affidavit and the Incident Report's prepared by Defendant Hudson indicate that Plaintiff was removed from his cell for decontamination approximately 16 minutes after the OC spray was deployed, Plaintiff attaches several sworn statements from inmates stating that 30 to 50 minutes passed before Plaintiff was taken for decontamination and medical treatment. A copy of the product label for "Phantom OC" by Sabre provides the following first aid instructions:

> Begin decontamination process as soon as possible after restraining inmate or subject. Remove subject from contaminated area to area of fresh air. Verbally reassure inmate or subject. If available, rinse effected areas with clean, cool running water and non-oil based soap. Repeat if necessary. Do not rub or use creams, lotions, oil., or salves. For eye contact. DO NOT RUB, flush was cold water for 15 minutes or longer if possible. Only qualified medical personnel should remove contacts. Periodically monitor subject until they are fully recovered. Get medical attention if symptoms persist.

(Document No. 172-3, p. 64.) Finally, Plaintiff submits copies of pertinent medical records indicating that he suffered from chemical burns. Specifically, Plaintiff's medical records contain the following notations: (1) September 3, 2013: "[Plaintiff] exposed to [OC] on 9-2-13 by officers; [Plaintiff] was decontaminated by medical staff, now [Plaintiff] has red areas to chest, face, nose, abdomen, legs; complains of burning to skin, has had 2 showers, now relief; appears to be superficial 1st degree chemical burn;" (2) September 9, 2013: "Refer to NASC for follow-up on chemical burns; minimal relief from silvadene cream;" and (3) September 11, 2013: chemical burns; "multiple dry, scabbed, red, excoriated patches on abdomen, arms, legs, and thighs; drainage from lesions; avoid scratching." (Document No. 172-3, pp. 3 - 5.) Based upon the foregoing, the undersigned finds that there are issues of fact as to the subjective component – whether Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety.

Accordingly, the undersigned respectfully recommends that Defendants' Motion for Summary Judgment be denied as to the above claim.[8]

### 5.      Assault and Battery Claim:

In their Motion for Summary Judgment, Defendants argue that "Plaintiff's assault and battery claims against Officer Hudson must fail as Officer Hudson was privileged to use such force against the Plaintiff." (Document No. 170, pp. 19 - 20.) Citing <u>Lewis</u>, 2010 WL 2671495, Defendants argue that "[i]t is widely recognized that prison guards may use chemical sprays when reasonably necessary to subdue an insubordinate prisoner because orders must be obeyed, and there are only so many choices available to correctional officers when an inmate refuses." (<u>Id.</u>, p. 19.) Defendants allege that Plaintiff "refused to be quiet when directed by Officer Hudson to immediately comply, thereby resulting in [Plaintiff] being sprayed with Oleoresin Capsicum by Officer Hudson." (<u>Id.</u>, pp. 19 - 20.) Defendants claim that Defendant Hudson's use of OC spray "was an appropriate measure to subdue an insubordinate prisoner." (<u>Id.</u>, p. 20.) Defendants assert that Defendants were privileged to spray Plaintiff with OC spray because he "was exacerbating the already existing disturbances." (<u>Id.</u>) Concerning the September 30, 2013 incident, Defendants argue that "there was no assault or battery against [Plaintiff] by Officer Hudson during the escort of [Plaintiff] to his cell." (<u>Id.</u>) Defendants explain that escorts of Quilliams prisoners are high risk and the always involve two officers. (<u>Id.</u>) Defendants contend inmates must face forward and Plaintiff knowingly disobeyed by turning his head. (<u>Id.</u>) Defendants argue "[t]here is no evidence of any kind to suggest that [Plaintiff] was slapped or that he sustained any manner of injury, including no credible medical evidence." (<u>Id.</u>) Defendants, therefore, conclude "there was no

---

[8]    Defendants' Motion for Summary Judgment did not address Plaintiff's claim of failure to protect and bystander liability against Defendants Hypes, Hess, and Boychuck.

assault or battery against Inmate Douty by Officer Hudson during the escort of [Plaintiff] to his cell." (Id.)

In Response, Plaintiff disputes that he refused an order and was causing a disturbance within the pod. (Document No. 173, pp. 5 - 7.) Plaintiff, therefore, concludes that Defendant Hudson had no reason to use force concerning the incident on September 2, 2013. (Id.) Concerning the incident on September 30, 2013, Plaintiff argues that "Hudson physically assaulted and threatened [Plaintiff] during an escort back to the cell following a disciplinary hearing while [Plaintiff] was securely handcuffed behind the back and wearing leg restraints." (Id., p. 2.) Plaintiff explains that on September 30, 2013, Defendant Hudson escorted Plaintiff back to his cell following a disciplinary hearing. (Id.) Plaintiff states that upon entering the Quilliams unit, Defendant Hudson "back handed [Plaintiff] in the back of the head." (Id.) Plaintiff states that he "had seen another inmate standing inside pod 3 and nodded his head in a gesture to say 'hi.'" (Id.) Plaintiff alleges that he "became terrified and did not know how to respond, but by asking Hudson if he was going to smack him again." (Id.) Plaintiff states that Defendant Hudson became "even more aggressive, forcefully squeezing [Plaintiff's] right back arm and in a threatening tone insinuating to [Plaintiff] that he will never learn." (Id.) Plaintiff asserts that he "had done nothing to provoke the attack as he was securely handcuffed behind the back wearing and wearing leg restraints." (Id.)

In West Virginia, a person is subject to liability for battery if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Tolliver v. The Kroger Co., 201 W.Va. 509, 498 S.E.2d 792, 711

(1997)(quoting Restatement (Second) of Torts § 13 (1965). An activity, however, that would otherwise subject a person to liability in tort for battery does not constitute tortious conduct if the actor is privileged to engaged in such conduct. Hutchinson v. West Virginia State Police, 731 F.Supp.2d 521, 547 (S.D.W.Va. Aug. 5, 2010)(citation omitted); Muehler v. Mena, 544 U.S. 93, 98-99, 125 S.Ct. 1465, 1467, 161 L.Ed.2d 299 (2005)("Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention.") "A privilege may be based upon . . . the fact that its exercise is necessary for the protection of some interest . . . of the public which is of such importance as to justify the harm caused or threatened by its exercise." Restatement (Second) of Torts § 10 (Am. Law Inst. 1965); Also see Lowe v. Spears, 2009 WL 1393860, * 6 (S.D.W.Va. May 15, 2009)(citations omitted)("Under West Virginia law, as under federal law, an officer may use the amount of force necessary to bring an arrestee under his control.")

As discussed above, there are genuine issues of material fact concerning Defendant Hudson's use of force on September 2, 2013. Construing the evidence in a light most favorable to Plaintiff, the undersigned finds that a jury could determine that Defendant Hudson used excessive force by deploying OC spray. If Defendant Hudson's use of OC spray is determined to be excessive, then his conduct would be offensive and would possibly preclude a finding of privilege as to Plaintiff's battery claim. The Court, therefore, finds that Defendant Hudson should be denied summary judgment concerning the September 2, 2013, incident.

Concerning the incident occurring on September 30, 2013, the undersigned finds that Defendant Hudson should be granted summary judgment. Defendant Hudson explains that escorting inmates from the Quilliams unit is considered high risk and inmates are required to face

49

forward during the escort. (Document No. 169-3, p. 4.) It is undisputed that some manner of force was used by Defendant Hudson during the escort of Plaintiff to his cell in the Quilliams unit. Although Plaintiff alleges that Defendant Hudson smacked him in the back of the head, Defendant Hudson states that he placed his "hand on the back of [Plaintiff's] neck and redirect[ed] him to a straight forward position along with giving him verbal directions . . . not to turn his head." (Id.) It is undisputed that Plaintiff disobeyed orders to look straight forward during his escort back to Quilliams. Plaintiff acknowledges that he looked towards another inmate and nodded his head to say "hi." Even assuming Defendant Hudson smacked Plaintiff in the back of the head, it is clear that the force used by Defendant Hudson was applied to gain Plaintiff's compliance with the order to look straight forward.[9] The undersigned, therefore, finds that Defendant Hudson was privileged to use force to make Plaintiff comply with orders to look forward and not make contact with other inmates during his escort to Quilliams. Based upon the foregoing, the undersigned respectfully recommends that the District Court deny Defendant Hudson's Motion as to Plaintiff's battery claim occurring on September 2, 2013, and grant Defendant Hudson's Motion as to Plaintiff's battery claim occurring on September 30, 2013.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT in part and DENY in part** Defendants' Motion for Summary Judgment (Document No. 169). Specifically, the undersigned recommends that Defendants' Motion for Summary Judgment be (1) **GRANTED** as to Plaintiff's claims against Defendants

---

[9]   Plaintiff's medical records do not support his claim that he suffered any injuries from the alleged battery. Specifically, Plaintiff's medical records state as follows: "Inmate's head checked, zero redness, swelling, bruising, or sign of being hit. Zero signs of distress at this time."(Document No. 172-3, p. 5.)

Rubenstein, Perry, Williams, and Hahn, (2) **GRANTED** as to Plaintiff's claim against Defendant

Hudson for battery occurring on September 30, 2013, and (3) **DENIED** as to all remaining claims.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is

hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge John T.

Copenhaver, Jr. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B),

and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have seventeen (17)

days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of

this Findings and Recommendation within which to file with the Clerk of this Court specific

written objections identifying the portions of the Findings and Recommendation to which

objection is made and the basis of such objection. Extension of this time period may be granted for

good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo*

review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155

(1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d

91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge

Copenhaver and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to

Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: April 27, 2016.

Omar J. Aboulhosn
United States Magistrate Judge